IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DOMAIN PROTECTION LLC, | § | |
|     *Plaintiff*, | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| Paul Raynor Keating, | § | |
|     *Defendant*. | § | |

# COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW, Domain Protection LLC, plaintiff, complaining of defendant PAUL RAYNOR KEATING, as follows:

## I. PARTIES

1. PLAINTIFF Domain Protection LLC is a citizen of Texas.

2. DEFENDANT PAUL RAYNOR KEATING, ("Keating"), is U.S. citizen, domiciled in California and who is resident in Spain.

## II. JURISDICTION & VENUE

3. The Court has jurisdiction over the lawsuit because this complaint arises under 18 U.S. Code §§ 2701 and 2707. Accordingly, this civil action arises out

of laws of the United States and jurisdiction is proper pursuant to 28 U.S.C. § 1331.

4. Further, the Court has jurisdiction over the lawsuit because this complaint arises under 28 U.S.C. §§ 1331, 1332(a)(2), 1357 and 1367, the Racketeer Influenced and Corrupt Organizations Act, codified as Title IX of the Organized Crime Control Act of 1970 and 18 U.S.C. §§ 1962 (c) and (d).

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2),(3), and (1391)(c)(3). A substantial part of the events giving rise to the claims pled in this action occurred in this district, the defendant is subject to the Court's personal jurisdiction by virtue of the RICO nation-wide service provision, and further, the defendant, not resident in the United States, is subject to suit in this district.

6. Jurisdiction is also proper pursuant to 28 U.S.C. §§ 1332 and 1367.

## III. CONDITIONS PRECEDENT

7. All conditions precedent have been performed or have occurred.

## IV.  RICO CLAIMS

*Overview*

8.   Paul Keating is an individual and Section 1961(3) person, capable of holding a legal or beneficial interest in property.  Keating, willfully and with knowledge of his activities, both conspired to violate and did violate Sections 1962 (b) and (c), engaging in a pattern of racketeering activity affecting interstate and foreign commerce.

9.   Keating knowingly engaged in a pattern of mail and wire fraud and extortion in a scheme to use fraud and threats to unlawfully obtain assets appraised as high as Sixty Million Dollars.  The vast majority of those assets are owned by Domain Protection LLC, and Domain Protection LLC has suffered actual damages proximately resulting from Keating's actions in furtherance of his scheme of mail and wire fraud.

*Jeff Baron & "The Village Trust"*

10.  Novo Point LLC and Quantec LLC are Cook Islands entities owned by the "Village Trust", a Cook Islands trust initially funded by one Jeffrey Baron with $100.00.

11.  Besides funding the Village Trust with $100.00, Baron controlled a domain name registrar, "Ondova", which had registered approximately a million domain names for a company "Netsphere Inc."  According to the pleadings on file in the related cases, Baron at one point started claiming that

the Netsphere domain name portfolio belonged to him, and seized control of the assets from Netsphere.

12. Netsphere attempted to recover its assets. Reportedly, Baron responded with an international campaign of vexatious litigation-- involving multiple suits brought by confederates, asserting duplicate claims against Netsphere literally around the globe.

13. In the face of Baron's international campaign of litigious suits, Netsphere eventually agreed to a settlement in which approximately 300,000 domain names would be assigned to Novo Point LLC and Quantec LLC, two entities owned by the Village Trust. At the time, Baron was emphatic in representing that the trust was a non-profit "Diabetes Research Trust" set up to fund diabetes research for children. Baron represented that the trust was a charitable trust that he did not control.

14. Soon after the Netsphere settlement was entered, Baron was placed into receivership for using a 'Ponzi scheme' in which he used fraud to secure the services of successive sets of new counsel to prosecute the suits against Netsphere and to defend against payment to the previous sets of unpaid counsel.[1]

15. It appears that this practice has been used by Baron to fuel years of vexatious litigation. By using multiple law firms in multiple jurisdictions, Baron was able to cause the cost of litigation to be so excessive that Netsphere was forced to settle.

---

[1] Dkt. 410 filed N.D. Tex. Case 3:09-cv-00988-L, at page 67; and see Dkt. 268.

16. Because Baron did not pay his own counsel, he was able to litigiously litigate in multiple forums without limitation. He then used the same practice to defend claims for payment by the unpaid counsel. Any firm seeking payment for the services provided was met by successive sets of (unpaid) counsel litigating an expanding set of claims of fraud, breach of fiduciary duty, conspiracy, etc. against the firm seeking payment for the work it had provided to Baron or his confederates.

17. One U.S. Federal District Court Judge described the extent and reach of the conduct of Baron and his confederates as follows:

> "Never in my forty some odd years in law have I ever seen a situation like this under any circumstances at all. This is beyond vexatious." [2]

18. Baron, (and confederates such as Keating), have reportedly engaged in the practice of non-payment for legal services obtained with a sequence of over *fifty-eight* different law firms. In succession, eventually each set of unpaid lawyers is replaced by a new set of lawyers whose services are used, unpaid, and so on. It appears that Keating has used this practice to obtain the services from multiple firms in Texas, Florida, and Australia.

19. While Baron has been declared a "vexatious litigant" by the U.S. District Court (N.D. Texas),[3] the Village Trust, has been a legitimate, registered trust in

---

[2] *See* Dkt. 233 in N.D. Tex. case 3:09-cv-00988-L at page 208.
[3] Through confederates like Keating, Baron has filed multiple conspiracy theory lawsuits against a senior U.S. Federal Judge, a U.S. Bankruptcy Judge, a U.S. Federal Receiver, a Chapter 11 Bankruptcy Trustee, counsel for same, a multitude of former counsel and counsel for opposing parties.

the Cook Islands. Likewise, the LLC entities Novo Point LLC and Quantec LLC are legitimate entities which have been independently controlled and managed.

20. Unlike Baron and Keating, the Village Trust and the LLC entities have not engaged in vexatious litigation, and have not been involved in defrauding law firms or theft of legal services.

*Lisa Katz*

21. In or about May 23, 2011, the Trustee of the Village Trust (and a subsidiary entity managing the LLCs) hired Lisa Katz of Dallas, Texas as the operations manager of Novo Point LLC and Quantec LLC.

22. At the time Katz was hired, the assets of the LLCs were frozen by the receivership placed over Baron (and over two dozen related entities). After years of effort, Counsel for the LLCs eventually secured the reversal of the receivership, and protected the LLCs assets from seizure in Baron's personal (involuntary) bankruptcy.

23. Then, on the eve of release of the LLCs' assets from receivership, Baron confederates David McNair and Paul Keating suddenly appeared, claiming that the LLC assets belonged to Jeff Baron, as the sole beneficiary of the Village Trust. Keating claimed that McNair was the manager of the LLCs, not Lisa Katz.

24. The U.S. District Court, (N.D. Tex.), rejected Baron/McNair/Keating's claim to authority and ordered that the assets be returned to Lisa Katz as the LLCs' authorized representative.

25. In response to the District Court's ruling against them, Keating began a campaign of interfering with the U.S. District Court's orders for the assets to be turned over to the possession and control of Lisa Katz.

26. By unauthorized access to the facilities controlling the electronic communications which controlled the domain name portfolio, Keating prevented the LLCs from accessing the electronic records for the domain names at the facilities, effectively hijacking the assets.

27. Meanwhile, Keating/McNair embarked on a vexatious campaign of duplicitous litigation against Lisa Katz, counsel for the LLCs, and entities doing business with the LLCs, filing duplicate claims in the Cook Islands, Australia, Florida, Bankruptcy Court in N.D. Texas, and state court in Collin County Texas.

28. Keating threw everything into the effort-- including a concerted campaign of wire fraud, multiple threats, filing of vexatious suits, and unauthorized access at the facilities controlling the domain name electronic records and communications to prevent Lisa Katz, and Domain Protection LLC from accessing the records and electronic communications.

29. Eventually, the U.S. District Court questioned the veracity of McNair and his counsel, rejected Keating/McNair's challenge to the authority of Lisa Katz;

ruled that McNair did not have the authority he claimed, and ordered that Lisa Katz had interim authority to manage the LLCs and their assets.

*Keating's Efforts to Avoid Paying Counsel*

30. As has been his pattern with approximately fifty prior law firms, Baron/Keating do not want the LLCs to pay the lawyer for the work performed and have filed multiple suits asserting that all the lawyers are entitled to no payments and payment by the LLCs to the firms is 'theft' of "Baron's" money.

31. To that end, Keating has worked to interfere with Domain Protection LLC's access to the digital information and communication controlling the domain name portfolio, and has engaged in a campaign of wire fraud in a willful attempt to violate the orders of the U.S. District Court and to interfere with the contract between Domain Protection LLC and Quantec LLC and Novo Point LLC, as well as the existing and contractual relations between Domain Protection LLC and others.

32. Keating and others conspired to have Keating use mail and wire fraud in a scheme to undermine the orders of the U.S. District Court and falsely represent that Lisa Katz did not have authority to act as the representative of Novo Point LLC and Quantec LLC.

33. The ultimate purpose of the scheme started as an artifice to avoid payment to the lawyers for their years of representation in courts around the globe including the U.S. Bankruptcy court, U.S. District Court, and U.S. Fifth Circuit Court of Appeals.

*The LLCs' Payment Arrangement to Unpaid Counsel*

34. When the receivership was finally wound-down Katz made her best efforts to manage the affairs of the LLCs while facing the constant attacks to the assets by Keating both in multiple (duplicate) suits around the world and from Keating's unauthorized access to the facilities that held and controlled the electronic data and communications for the domain names.

35. One of the LLCs' pressing issues was unpaid bills to lawyers who had worked for years, and were entitled to immediate payment. In light of the circumstances and financial situation of the LLCs, Katz was able to secure substantial fee reductions, work out a partial payment to one attorney by paying in domain names, and securing a delay in enforcement of claims from other attorneys **by placing the LLCs' domain names in escrow to guarantee payment of the outstanding fees**.

36. In early 2014, Domain Protection LLC was set up as an independent escrow company to hold and, as necessary, liquidate domain name assets to pay the past due fees to approximately a dozen law firms who had provided services for the LLCs, including three firms holding secured claims.

37. Today, Domain Protection LLC owns and is the registrant of approximately 150,000 domain names. Due to Keating's RICO actions, and unauthorized access of the domain name registrar facilities, no payments have yet been made by Domain Protection LLC, on the millions of dollars in outstanding past due legal fees, for services provided by more than a dozen firms.

*The RICO Scheme*

38. Baron/Keating/McNair initially tried to convince the U.S. District Court that McNair and Keating were authorized to act on behalf of Novo Point LLC and Quantec LLC. Having failed in their attempt to persuade the Court, Keating redoubled his efforts outside of court and engaged in a stepped-up campaign of fraud to frustrate the Court's orders.

39. Keating engaged in wire fraud to interfere with the orders of the U.S. District Court and to interfere with Domain Protection LLCs' control and possession of the domain name assets. The essence of the Baron-Keating scheme was to use wire fraud to convince third parties that various shell companies were legitimate and had appointed McNair, and not Lisa Katz, as the manager of Novo Point LLC and Quantec LLC. The scheme was designed to combine threats and fraud to secure the transfer of the assets to Keating–despite the U.S. District Court Order to the contrary. To that end, Keating made fraudulent communications by wire in violation of 18 U.S.C. 1343. The action is a predicate RICO act in a scheme designed to use wire fraud to obtain control over millions of dollars in assets.

*Keating's RICO Enterprises*

40. Upon information and belief, Keating controls "RPV Limited" in the actions complained of in this suit. Through his control of RPV Ltd., Keating has engaged in a continuous pattern of related acts of wire fraud having the same purpose and as part of the same scheme to prevent payment to Novo

Point LLC and Quantec LLC's counsel and creditors, and later, to misappropriate the assets of Domain Protection LLC.

41. The corporate enterprise controlled by Keating participated in the scheme and contributed a bogus cloak of 'authority' as an integral component of Keating's scheme of using a series of fraudulent communications by wire. The Keating corporate enterprise both (a) is engaged in activities affecting foreign commerce, and (b) the activities of Keating's enterprise directly affect both interstate and foreign commerce through its interference with Domain Protection's control of its domain name assets used in interstate and international commerce, and interference with Domain Protection's interstate commercial transactions.

42. Additionally, millions of international and interstate internet users have been affected by Keating's actions complained of herein, because their access to tens of thousands of domain names have been affected, as Keating has interfered with Domain Protection's control over those names.

*Specific Examples of Acts of Wire Fraud*

43. Examples of Keating's wire fraud include the following:

44. <u>On Thursday, April 30, 2015</u>, Keating sent, by wire, from Spain to the United States, a letter to Kenneth Abel, a representative of Domain Holdings in Florida, stating with respect to assets over which Keating sought control, **"there has never been any form of order confirming the position of Ms. Katz and Mr. Payne and denying authority of my clients."**

45. Keating was seeking to have Domain Holdings violate the U.S. District Court order requiring that payments from Domain Holdings be made to Lisa Katz as the authorized representative of Novo Point LLC and Quantec LLC. Keating, however, was aware of the District Court orders confirming the position of Katz is the authorized representative of Novo Point LLC and Quantec LLC, and holding, at least, interim authority over the management of the LLCs and their assets.

46. Keating's April 30, 2015 letter was recalcitrant, sent barely a month after the U.S. District Court ruled that:

> "the repeated assertions by Baron, the LLCs, and those acting on their behalf in various court filings, that this court expressly declined to exercise jurisdiction or lacked jurisdiction all together, **grossly mischaracterizes** the court's orders and the proceedings in Netsphere. Moreover, if the court determines that such mischaracterizations or other actions by Baron and those acting on his or the LLCs' behalf were taken to interfere with or undermine the court's orders regarding the winding down of the receivership, including **the return of the LLCs' assets to Katz**, the court retains jurisdiction to initiate contempt proceedings."

47. <u>On July 18, 2014</u>, Keating sent, by wire, from Spain to Dallas, Texas, a letter to counsel for Novo Point LLC and Quantec LLC, representing that "under Ms. Katz's now terminated agreement, the terms thereof required her (and you) to obtain consent of the LLCs prior to undertaking acts specified therein".   In other words, Keating represented that by the terms of Katz'

contract, counsel was required to obtain separate consent of the LLCs, to accept representation on behalf of the LLCs.   The representation was false, and known by Keating to be false when made.

48.  These two specific examples, are examples from a course of conduct undertaken by Keating continuously and systematically from on or about March 2014 and continuing to the present day.  Keating's conduct has been to repeatedly engage in wire fraud to convince third parties to disobey the orders of the U.S. Federal Court in an effort to interfere with Lisa Katz' control over the domain name assets, and assignment of those assets to Domain Protection LLC.

## V.  UNAUTHORIZED ACCESS

49.  The U.S. District Court clearly authorized Lisa Katz, not Paul Keating, to possess and control the domain name assets which were registered at Fabulous.com with relation to Novo Point LLC and Quantec LLC.

50.  Yet, in contempt of the Court's orders, Keating intentionally accessed, without authorization, the facility through which the electronic communication service for Domain Protection LLC's domain names is provided, ("Fabulous.com"). Further, Keating intentionally exceeded his authorization to access that facility and was able, thereby, to prevent the authorized access to the data and electronic communication while it was in electronic storage in the system.

51.   Keating acted for commercial advantage and private commercial gain.

52. Specifically, Keating has a close personal relationship with Fabulous.com the facility through which the electronic communication service for Domain Protection LLC's domain names is provided.   Keating has gone into business with key personnel now at Fabulous.com, or previously employed by Fabulous.com, including Fabulous.com executives Mike Roberston and Jen Sale, as well as the CIO/CTO of Fabulous' parent company Dark Blue Sea, Bill Vanderent.

53. By leveraging his personal relationship at the facility,  Keating was able to able to access without authorization, and by exceeding his authorization to access the facility, to prevent the authorized access by Lisa Katz and Domain Protection.  By his unauthorized access of the facility, Keating has prevented Domain Protection from being able to properly sell domain names, manage the domain names, or generate income from the domain names it owns.

54. Keating's unauthorized access to the DNS and WHOIS data and communications at the Fabulous.com facility, and his preventing authorized access to the data and communications by Lisa Katz, has caused over $300,000.00 in damages to Domain Protection, annually.  Keating has prevented access to change the WHOIS and DNS information,  and to unlock the domain names for transfer.  As a result, domain renewal fees are at least $150,000.00 higher than necessary and income generation is approximately $200,000.00 per year less than guaranteed income available through third parties, but made impossible because of Keating's access and prevention of the authorized access of Lisa Katz and Domain Protection, LLC.

55.  Keating engaged in his violation with a knowing and intentional state of mind.  Keating had actual knowledge of the U.S. District Court orders directing Lisa Katz to have control of Novo Point LLC and Quantec LLC and their assets—including the assets registered with the Fabulous.com facility.

56.  Keating also attempted directly and/or through a co-conspirator, David McNair, to undermine the order of the U.S. District Court directing turnover of the assets of Novo Point LLC and Quantec LLC to Lisa Katz:  Keating used his 'inside connections' and wire fraud, to attempt to secure the turnover of assets to Keating, through his company "Domain Guardians" (in which the Fabulous.com and Dark Blue Sea personnel are also involved, as detailed above).

## VI.  STATE LAW DIVERSITY CLAIMS

57.  <u>Tortious Interference with Contract.</u>  Based upon the foregoing, Keating has willfully and intentionally interfered with Domain Protection's contract, or potential contract with its domain name registrar and with Novo Point LLC and Quantec LLC.  Domain Protection has a valid assignment from Novo Point LLC and Quantec LLC.  Keating has interfered with that assignment.  Moreover, Keating has interfered, with the domain name registrar, and Keating's interference with the contract proximately caused Domain Protection to incur additional costs and to lose revenue.

58.  <u>Tortuous Interference with Prospective Relations</u>.  Based upon the foregoing, Keating has also willfully and intentionally interfered with Domain

Protection's prospective relations with domain name management and monetization providers. Domain Protection's business relationship with domain name management firms had not been reduced to contract, but formation of a contract was reasonably probable, but for Keating's interference and wire fraud.

59. Because of Keating's willful and intentional interference, Domain Protection has incurred substantial expenses and proximately suffered actual damages including the loss to its annual income stream in the amount of approximately $250,000.00. But for Keating's tortuous interference, domain name management and monetization providers would be willing to contract with Domain Protection and provide an income stream for domain names that are pending development. However, because of Keating's actions complained of herein, Domain Protection has suffered the actual damages described above.

## VII.  DEMAND FOR JURY TRIAL

60. Pursuant to Fed.R.Civ.P. 38, Plaintiff demands a jury trial.

## VIII.  CONCLUSION & PRAYER

Based on the foregoing, Domain Protection LLC prays the defendant be summoned to appear and answer, and upon final trial that it recover its damages from the defendant and further for the following legal and equitable relief:

1. Civil remedies pursuant to 18 U.S.C. 1964, including threefold the damages sustained and the cost of the suit, including reasonable attorney's fees;

2. Civil remedies pursuant to 18 U.S.C. 2707, including actual and punitive damages and attorney fees;

3. Actual and exemplary damages resulting from the state law tort claims complained of in this complaint, attorney fees and the cots of suit;

4. Equitable relief including a temporary restraining order and a preliminary and permanent injunction preventing the unauthorized access and state law tortuous actions complained of in this complaint; and

5. Such other and further relief as Plaintiff may be shown justly entitled.

        Respectfully submitted,

        /s/ Christopher A. Payne
Christopher A. Payne
SandlerPayne, PLLC
6600 Lyndon B Johnson Fwy Ste 183
Dallas, TX 75240
Phone: 972 284-0731
Fax: 214 453-2435
chris@sandlerpayne.com